1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                        **DISTRICT OF NEVADA**

10

11   CARLA VAN PELT,                    )        3:11-cv-00061-HDM-VPC
                                        )
12               Plaintiff,             )
                                        )        ORDER
13   vs.                                )
                                        )
14   HOWARD SKOLNIK, JACK PALMER,       )
     JAMES BENEDETTI, ROD MOORE,        )
15   LAWRENCE BOOTH, JAMES BACA, EDGAR  )
     MILLER, ELIZABETH WALSH, and THE   )
16   STATE OF NEVADA EX REL ITS         )
     DEPARTMENT OF CORRECTIONS,         )
17                                      )
                 Defendants.            )
18   _____)

19        Before the court is the defendants' motion for summary

20   judgment (#35).  Plaintiff has opposed (#38), and defendants have

21   replied (#43).

22        Defendants are Nevada Department of Corrections ("NDOC")

23   employees and the State of Nevada.  Plaintiff Carla Van Pelt

24   ("plaintiff") is a former NDOC employee.  Pursuant to the parties'

25   stipulation, plaintiff filed a second amended complaint asserting:

26   (1) First Amendment retaliation under 42 U.S.C. § 1983; (2) Title

27   VII retaliation; and (3) Title VII gender discrimination.

28   Defendants now seek summary judgment on plaintiff's claims.

                                   1

**Facts**[1]

From 1989 until 1997, and again from 2000 until her termination in November 2010, plaintiff worked for NDOC at the Northern Nevada Correctional Center ("NNCC"). At the time of her termination, she was a program officer in OASIS, a drug and alcohol addiction program for inmates. (*See* Def. Mot. Summ. J. Ex. A at 3, 29).[2] At various times, her supervisors included defendants former Associate Warden of Programs James Baca ("Baca"), acting Associate Warden of Programs Lisa Walsh ("Walsh"), and OASIS site supervisor Ed Miller ("Miller").

Plaintiff's complaint focuses primarily on events that took place between December 2009 and May 2010, when she was placed on administrative leave before eventually being terminated. She asserts that she suffered several adverse employment actions, including termination, for engaging in protected activities, and that she was subjected to gender discrimination. Defendants deny plaintiff's claims and assert that she was terminated for falsifying log books and time sheets. The following facts, set forth in a light most favorable to the plaintiff, appear from the record.

On December 10, 2009, plaintiff testified at an NDOC

---

[1] Defendants assert broadly that plaintiff has failed to authenticate her exhibits. The court considers this argument only where defendants have raised a specific objection. Defendants make just one specific objection, to plaintiff's exhibit #8, which plaintiff claims is a notice of investigation that she received on April 1, 2010. Exhibit 8 is not authenticated and does not even appear to be a notice of investigation. The court therefore finds defendants' objection well taken and will not consider plaintiff's exhibit 8.

[2] All page citations to defendants' exhibits are to the Bates-stamped number at the bottom of the page.

employee's administrative disciplinary hearing pursuant to

subpoena.  (Def. Mot. Summ. J. Ex. A at 41).  Plaintiff testified

that the actions for which the employee was facing discipline were

actions plaintiff told her to take, and that she believed the

proposed discipline to be excessive.  (*Id.*)  Plaintiff claims she

also testified

> that I was like the little warden of the [OASIS] unit; I
> did everything that the warden does in that particular
> unit.  And I told them I did all the budgeting, I did the
> making sure maintenance stuff was done, the hiring, the
> firing, the personnel stuff, the purchasing.  It was its
> own little prison within the prison.

(Pl. Dep. 30:8-19).[3]

On December 18, 2009, defendant Warden James Benedetti

("Benedetti") emailed NNCC staff to notify them that all employees

were required to sign in at the gatehouse when arriving to work.

(Def. Mot. Summ. J. Ex. A at 24).  Although plaintiff denies

getting any such email or notification, she was aware that she was

required to sign in at the gatehouse.  (Pl. Dep. 56-57).

On December 30, 2009, plaintiff hired a female substance abuse

counselor for the OASIS program.  (Pl. Opp'n Ex. 7).  On January 4,

2010, plaintiff claims that Miller told her that she had to unhire

the new employee, stating he didn't want another "f---ing female"

in the unit because they were too much trouble.  Plaintiff claims

that although she reported this to two supervisors and a personnel

tech, nothing was done.  (*Id.*)

On January 22, 2010, Baca conducted a staff meeting during

which plaintiff was stripped of any supervisory duties she had – or

---

[3] Parts of plaintiff's deposition are located in Exhibit F to
defendants' motion for summary judgment and other parts are located in
Exhibit 2 to plaintiff's opposition.

thought she had – in the OASIS program, Miller was designated as plaintiff's supervisor, and all employees, including plaintiff, were directed to fill out and submit leave slips and obtain prior approval for all leave. (Def. Mot. Summ. J. Ex. A at 42; Pl. Opp'n Ex. 3). Baca further instructed that all employees would start working shifts from 8:00 a.m. to 4:00 or 8:00 am. to 5:00 p.m. (*Id.*). Plaintiff claims that before this meeting she was acting director of the OASIS unit north. (*See* Def. Mot. Summ. J. Ex. A at 30).

After the January 22, 2010, meeting, plaintiff allegedly told another OASIS employee that she would not help Miller learn his new supervisory job. (*See* Pl. Opp'n Ex. 3).

On January 30, 2010, plaintiff filed a NERC/EEOC complaint (hereinafter "EEOC complaint"). (Second Am. Compl. 1). Plaintiff claims that the complaint alleged "disparate treatment" by "coworkers and supervisors, including transmission of pornography."[4] (Pl. Opp'n 2).

On February 11, 2010, Baca issued plaintiff a "Letter of Instruction for Insubordination," for, in part, plaintiff's statement after the January 22, 2010, meeting.[5] (Pl. Opp'n Ex. 3). After receiving the letter of instruction, and at that meeting, plaintiff informed Baca, Walsh, and Miller about her EEOC complaint. (Pl. Opp'n Ex. 7).

On February 15, 2010, plaintiff claims she submitted an

---

[4] It is unknown exactly what plaintiff alleged in this complaint as it is not part of the record. Defendants do not dispute that the complaint was filed or plaintiff's characterization of its contents.

[5] It appears that it also alleged other instances of insubordination, but plaintiff has not attached all pages of the document.

4

incident report alleging that Miller had given favorable treatment to an inmate.  (Pl. Opp'n Ex. 7).

On March 1, 2010, plaintiff signed an acknowledgment prepared by Miller that signing in and out of gatehouse and at the unit was "important."  (Def. Mot. Summ. J. Ex. A at 21).

On March 2, 2010, plaintiff informed NDOC Director Howard Skolnik ("Skolnik") of her EEOC complaint.  (Pl. Opp'n Ex. 7).  As she was leaving, plaintiff heard Skolnik "say that he was going to do what he could to get rid of me."  (Pl. Dep. 72).  Afterwards, plaintiff claims Baca "screamed" at her for talking directly to Skolnik.[6]  (Pl. Dep. 35-36).

On March 3, 2010, plaintiff allegedly told Miller that defendant Larry Booth ("Booth"), a coworker in the OASIS program, was creating a hostile work environment and needed his "ass kicked."  (Def. Mot. Summ. J. Ex. A at 77; Pl. Opp'n Ex. 5). Plaintiff denies this, insisting that instead she said that Booth "'need[ed] to come off his high horse' because she was tired of the comments he was making and his total disregard for anything she had to say."  (Def. Mot. Summ. J. Ex. A at 36).  That same date, an OASIS employee wrote an incident report about the unprofessional and hostile way he believed Booth and Miller were treating plaintiff.  (Pl. Opp'n Ex. 4).  In particular, the employee noted that Booth and Miller were trying to isolate and ignore plaintiff

---

[6] Later that day, plaintiff apparently received a written reprimand issued by Baca and approved by Benedetti.  (Pl. Opp'n Ex.7; *id.* Ex. 11 (Benedetti Dep. 10))).  According to plaintiff, the letter scolded her for talking directly to Skolnik and for writing the incident report about Miller.  (Pl. Opp'n Ex. 7).  It also appears the letter charged insubordination for plaintiff telling two correctional officers that they should watch their backs when Miller was around.  (*Id.* Ex. 11 (Benedetti Dep. 10)).

1  and that they showed visible disregard for her opinions during
2  staff meetings.  (*Id.*)

3       On March 11, 2010, plaintiff left work at 2 p.m. to pick up
4  her car and did not return for the rest of the day.  (Def. Mot.
5  Summ. J. Ex. A 76).  She did not tell any of her supervisors
6  directly that she was leaving, although she was required to do so.
7  On March 12, 2010, plaintiff again left work in the early
8  afternoon, telling another NNCC employee that she had hurt her
9  back.  (*Id.* at 75).  On March 15, 2010, plaintiff arrived late to
10 work, saying she had forgotten to change her clock for daylight
11 savings time.  (*Id.* at 76).

12      At some point, an internal investigation into allegations that
13 plaintiff had been discourteous, been insubordinate, made false and
14 misleading statements, neglected her duties, and engaged in
15 unbecoming conduct began.  (*See* Def. Mot. Summ. J. Ex. A at 25).
16 The exact date the investigation was initiated is unclear from the
17 record, but based on the timing of the allegations, which included
18 instances as late as March 12, 2010, and the timing of the
19 interviews, the first of which apparently took place on March 17,
20 2010, it may be inferred the investigation began sometime around
21 those two dates.  (*See id.* at 26, 29).

22      On March 15, 2010, plaintiff filed an incident report stating
23 that during an OASIS staff meeting she had complained to Miller and
24 Booth about the hostile work environment, including their excluding
25 her from meetings and decisions about the program.  According to
26 plaintiff, Miller and Booth began yelling at her and denying her
27 allegations.  The report stated that the hostility had been
28 occurring for the past six weeks and was so bad even the inmates

noticed it.  (Pl. Opp'n Ex. 6).  Around this time, it appears, plaintiff met with Baca and Walsh about the problems she was having with Miller and Booth.  (Pl. Dep. 38).  According to plaintiff, Baca said "there may be something to what you're saying."  (*Id.*) The following day, Baca was transferred to another institution, and Walsh became acting associate warden of programs.  (Pl. Dep. 38).

Toward the end of March 2010, a number of events occurred.

First, plaintiff complained to Skolnik of retaliatory harassment by Miller, Booth, Walsh, and Baca following the filing of her EEOC complaint.  (Pl. Opp'n Ex. 7).

Second, Walsh advised plaintiff that she was chronically late and gave her the option to change her schedule.  Plaintiff responded that as an exempt employee she did not have to work 40 hours a week, and Walsh asked for proof of exempt status.  Although plaintiff promised to provide such proof, there is no indication in the record that she ever did.[7]  (Def. Mot. Summ. J. Ex. A at 78-79).

Third, plaintiff showed Walsh evidence of the alleged harassment underlying her EEOC complaint, which was a video that Booth had sent to her "sometime ago" of a man's buttocks and people's reactions to it.  (Def. Mot. Summ. J. Ex. A at 42). According to Booth, he had sent the video a year and a half earlier, he had sent it to everybody and not just plaintiff, and

---

[7]   In fact, an NDOC personnel officer avers that no record exists showing plaintiff was an exempt employee, and that the position of OASIS program director was not an exempt position.  (Def. Mot. Summ. J. Ex. E at 178).  Plaintiff claims that she received notice from personnel that her position was exempt because she was the program's acting director in the north, but she provides no evidence to support this claim. (Pl. Dep. 17:12-24).

plaintiff had not complained of it at the time.  (Def. Reply (Booth Dep. 24)).

Finally, after showing Walsh the alleged evidence of harassment on or about March 31, 2010, plaintiff claims Walsh told her three times that she needed to withdraw her EEOC complaint or "somebody, looking directly at me, is going to get fired."  (Pl. Dep. 35:16-24; *see also* Def. Mot. Summ. J. Ex. A at 38). Immediately after this, as plaintiff was leaving Walsh's office, plaintiff heard Walsh pick up the phone, call investigator Rod Moore ("Moore"), and tell him, "It's on."[8]  (Pl. Dep. 35:21-24).

On April 5, 2010, plaintiff began a new schedule, working 8:30 a.m. to 4:30 p.m.  (Def. Mot. Summ. J. Ex. A at 117).

On May 12, 2010, plaintiff was placed on administrative leave following allegations that she had taken her unit's logbook into her office to "doctor" it – that is, to falsify her hours worked in order to cover up that she was arriving late and leaving early. (Def. Mot. Summ. J. Ex. A at 11, 14, 22).  Plaintiff denied doctoring the log book and claimed she was doing her "statistics ... like always."  (Pl. Dep. 47-48).

On June 16, 2010, Moore issued a report of investigation into the following allegations: (1) that on several occasions in March and April 2010 plaintiff arrived late to work, left early, and falsified logbooks and time sheets to show that she had worked

---

[8]  Plaintiff claims that the day after this last conversation, she received a notice of investigation, but the evidence she attaches to prove such – Exhibit 8 – is unauthenticated and does not appear to be a notice of investigation.  *See supra* n.1.  At any rate, it is clear from the record that plaintiff was already under at least one investigation by the time of her conversation with Walsh.

longer hours than she actually had;[9] and (2) that plaintiff had doctored the unit logbook.  (Def. Mot. Summ. J. Ex. A at 11, 14). On July 16, 2010, Moore issued a second report of investigation into the following allegations: (1) that from October 2009 to March 2010 plaintiff chronically arrived for work late, left early, and concealed that fact on her timesheets; (2) that plaintiff repeatedly failed to sign into the gatehouse and unit logbooks; (3) that in summer 2009 plaintiff threw a chair during a meeting with Miller, Booth, and others when the issue of plaintiff's performance came up; (4) that plaintiff improperly claimed to be an exempt employee who could work from home; (5) that plaintiff misused the computer by visiting numerous sites not related to her job duties; and (6) that plaintiff told Miller that Booth needed his "ass kicked."  (Def. Mot. Summ. J. Ex. A at 26-31).

On October 14, 2010, plaintiff was served with a specificity of charges, which contained many of the factual allegations investigated by Moore.  (Def. Mot. Summ. J. Ex. A at 2, 7).  A predisciplinary hearing took place on October 26, 2010, at which plaintiff did not appear.  (Def. Mot. Summ. J. Ex. A at 2).  After the hearing, plaintiff was terminated effective November 1, 2010. (*Id.*)

On March 2, 2011, plaintiff received a right-to-sue letter from the EEOC.

**Standard**

"The court shall grant summary judgment if the movant shows

---

[9]   The investigation report specifies four such times: (1) March 24, 2010; (2) March 31, 2010; (3) April 23, 2010; (4) April 20, 2010, along with a number of other unspecified times.  (Def. Mot. Summ. J. Ex. A at 15).

that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1378 (9th Cir. 1998).  A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Lynn v. Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir. 1986); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented

supporting a position is insufficient to allow a reasonable juror
to conclude that the position more likely than not is true, the
court remains free . . . to grant summary judgment."). Moreover,
"[i]f the factual context makes the non-moving party's claim of a
disputed fact implausible, then that party must come forward with
more persuasive evidence than otherwise would be necessary to show
there is a genuine issue for trial." *Blue Ridge Ins. Co. v.
Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Cal.
Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818
F.2d 1466, 1468 (9th Cir. 1987)).  Conclusory allegations that are
unsupported by factual data cannot defeat a motion for summary
judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Finally, if the nonmoving party fails to present an adequate
opposition to a summary judgment motion, the court need not search
the entire record for evidence that demonstrates the existence of a
genuine issue of fact.  *See Carmen v. San Francisco Unified Sch.
Dist.*, 237 F.3d 1026, 1029-31 (9th Cir. 2001) (holding that "the
district court may determine whether there is a genuine issue of
fact, on summary judgment, based on the papers submitted on the
motion and such other papers as may be on file and specifically
referred to and facts therein set forth in the motion papers").
The district court need not "scour the record in search of a
genuine issue of triable fact," but rather must "rely on the
nonmoving party to identify with reasonable particularity the
evidence that precludes summary judgment." *Keenan v. Allan*, 91
F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins.
Co.*, 55 F.3d 247, 251 (7th Cir.1995)).  "[The nonmoving party's]
burden to respond is really an opportunity to assist the court in

understanding the facts.  But if the nonmoving party fails to discharge that burden-for example by remaining silent-its opportunity is waived and its case wagered." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

**Analysis**

Defendants moved for summary judgment on plaintiff's claims, arguing: (1) plaintiff's First Amendment retaliation claim fails because she has failed to show she spoke on a matter of public concern as a private citizen; (2) plaintiff's gender discrimination claim fails because she has not alleged or shown any similarly situated employee was treated differently than she was; (3) res judicata on the basis of administrative decisions precludes plaintiff's claims; and (4) several of the defendants were not personally involved.  Defendants did not move for summary judgment on the merits on plaintiff's Title VII retaliation claim.

**I. First Amendment Retaliation**

To prove a violation under 42 U.S.C. § 1983, a plaintiff must establish that the defendants (1) acting under color of law (2) deprived plaintiff of the rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986).  Plaintiff's first claim for relief asserts First Amendment retaliation against the individual defendants.  There is no dispute that the defendants were acting under color of law.  The issue is thus whether defendants deprived plaintiff of her First Amendment rights.

"It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public

interest.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).
First Amendment retaliation claims are analyzed through a
sequential five-step test: (1) whether the plaintiff spoke on a
matter of public concern; (2) whether the plaintiff spoke as a
private citizen or public employee; (3) whether the plaintiff's
protected speech was a substantial or motivating factor in the
adverse employment action; (4) whether the state had an adequate
justification for treating the employee differently from other
members of the general public; and (5) whether the state would have
taken the adverse employment action even absent the protected
speech. *Id.* at 1070.

"Speech involves a matter of public concern when it can fairly
be considered to relate to 'any matter of political, social, or
other concern to the community.'" *Eng*, 552 F.3d at 1070.
This inquiry is a question of law and is based on the "content,
form, and context of a given statement, as revealed by the record
as a whole." *Id.* Plaintiff bears the burden of showing her speech
was a matter of public concern. *Id.*

The scope of the public concern element has been defined
broadly. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710
(9th Cir. 2009). "Speech that concerns issues about which
information is needed or appropriate to enable the members of
society to make informed decisions about the operation of their
government merits the highest degree of first amendment
protection." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th
Cir. 2003). On the other hand, "individual personnel disputes and
grievances" that are "of no relevance to the public's evaluation of
the performance of governmental agencies" are not usually of public

concern.  *Eng*, 552 F.3d at 1070.  "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to coworkers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern."  *Desrochers*, 572 F.3d at 710.  "The same is true of speech that relates to internal power struggles within the workplace."  *Id.*  Opposition to unlawful discrimination by public employees can be a matter of public concern.  *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925-26 (9th Cir. 2006).

Plaintiff must also show the speech was made in her capacity as a private citizen and not as a public employee.  *Eng*, 552 F.3d at 1071.  Statements which the speaker "had no official duty" to make or which were not the product of "performing the tasks the employee was paid to perform" satisfy this requirement.  *Id.*  Public employees do not have First Amendment protection for statements made pursuant to their official duties.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Plaintiff's complaint asserts three instances of allegedly protected speech: (1) her December 10, 2009, predisciplinary hearing testimony; (2) her filing of the incident report alleging favorable inmate treatment by Miller; and (3) her filing of an EEOC complaint and the internal report of such.  Defendants argue that none of this speech was on a matter of public concern or done as a private citizen.

A. Disciplinary Hearing Testimony

The record reflects that plaintiff's testimony at the

14

predisciplinary hearing of another consisted of three statements: (1) that plaintiff had directed the employee to engage in the conduct for which she was being punished; (2) that plaintiff thought the proposed discipline was excessive; and (3) that plaintiff testified "that I was like the little warden of the unit; I did everything that the warden does in that particular unit.  And I told them I did all the budgeting, I did the making sure maintenance stuff was done, the hiring, the firing, the personnel stuff, the purchasing.  It was its own little prison within the prison."  (Pl. Dep. 30:8-19).  All three statements directly related to plaintiff's job duties (or perceived job duties). Accordingly, in light of the speech's context, content, and form, the court concludes that as a matter of law plaintiff's testimony was not on a matter of public concern.

Further, plaintiff has raised no genuine issue of material fact that as an NDOC employee she was required to testify at the hearing pursuant to the subpoena.  (Def. Mot. Summ. J. Ex. D 172 ¶ T; *id.* Ex. F 191-92).  Accordingly, because plaintiff was under an official duty to speak, this speech was not, as a matter of law, made in her capacity as a private citizen.

B. Incident Report Regarding Favorable Treatment

The incident report has not been included in the record by either party.  Accordingly, it is impossible to determine whether plaintiff's statements therein spoke to a matter of public concern. Even if they did, however, the report was not filed in plaintiff's capacity as a private citizen.  Rather, she was required to file reports about alleged misconduct pursuant to NDOC regulations. (*See* Def. Mot. Summ. J. Ex. C at 157; Ex. D at 172); *see also*

*Anthoine v. N. Cen. Counties Consortium*, 605 F.3d 740, 749 (9th Cir. 2010) (explaining that in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) the court held that plaintiff's report that inmates were sexually harassing her made to officials in the chain of command were made pursuant to her official duties because she was required to report inmate misconduct). Thus, plaintiff has failed to support her claim with respect to this speech.

C. EEOC Complaint and Internal Report

Neither party has included plaintiff's EEOC complaint as part of the record. Therefore the court is unable to determine whether the complaint or the internal report thereof involved a matter of public concern and if so to what extent. Thus, plaintiff has failed to support her claim in this regard.

The defendants are therefore entitled to judgment as a matter of law on plaintiff's First Amendment retaliation claim. Having so concluded, it is unnecessary for the court to address the defendants' arguments regarding personal participation.

**II. Title VII Retaliation**

Under Title VII, it is unlawful for an employer to discriminate against an employee because the employee has opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a). Title VII claims are analyzed under a burden-shifting framework. First, the plaintiff must establish a prima facie case of discrimination. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Then, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Id.* at 802. Once met, the plaintiff must offer evidence that the employer's stated reasons are pretextual. *Id.* at 804.

1   "[S]ummary judgment is not appropriate if, based on the evidence in
2   the record, a reasonable jury could conclude by a preponderance of
3   the evidence that the defendant undertook the challenged employment
4   action because of the plaintiff's" protected activity. *See*
5   *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th
6   Cir. 2006).

7        A. Prima Facie Case

8        To establish a prima facie case of retaliation, the plaintiff
9   must show: (1) she engaged in a protected activity; (2) she
10  suffered an adverse employment action; and (3) a causal link exists
11  between the protected activity and the adverse action. *Id.* at
12  1034-35.

13       "To show the requisite causal link, the plaintiff must present
14  evidence sufficient to raise the inference that her protected
15  activity was the likely reason for the adverse action." *Cohen v.*
16  *Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  "At the prima
17  facie stage of a retaliation case, the casual link element is
18  construed broadly so that a plaintiff merely has to prove that the
19  protected activity and the negative employment action are not
20  completely unrelated." *Poland v. Chertoff*, 494 F.3d 1174, 1181 n.2
21  (9th Cir. 2007) (internal citation and quotations omitted).

22            i. Protected Activity

23       Although the complaint is not part of the record, defendants
24  have not disputed that plaintiff filed an EEOC complaint alleging
25  "disparate treatment" by "coworkers and supervisors, including
26  transmission of pornography."  (Pl. Opp'n 2).  While the
27  plaintiff's failure to include the EEOC complaint is fatal to her
28  First Amendment claim, which requires careful analysis of the

17

speech itself and the context in which it is made, it is not fatal with respect to her Title VII claim.  All that the plaintiff is required to show is that she complained of activity that a reasonable person would believe is unlawful under Title VII.  The plaintiff has satisfied this requirement by the fact she filed a Title VII EEOC complaint alleging disparate treatment and transmission of pornography and that she received a right-to-sue letter.  What's more, plaintiff told her supervisors of her complaint and showed defendant Walsh the evidence she believed supported it.  This is sufficient to meet this element of plaintiff's prima facie case.

ii. Adverse Employment Action

Plaintiff suffered an adverse employment action by being terminated.

iii. Causal Link

Plaintiff filed her EEOC complaint on January 30, 2010.  She advised many of her superiors of the complaint on February 11, 2010, and advised NDOC Director Howard Skolnik specifically on March 2, 2010.  Plaintiff was placed on administrative leave on May 12, 2010, after being accused of falsifying logbooks.  Although plaintiff was not ultimately terminated until November 2010, the investigations leading to her termination began within a few months, if not weeks, of many defendants learning of her Title VII claim.[10]  Construing this element broadly at the prima facie stage,

_____

[10] While defendants claim that the investigations had already begun by this point, they provide no evidence to support their assertion.  Even if that is true, however, the investigations clearly picked up steam after defendants learned of the EEOC complaint, as the bulk of the specific allegations of misconduct were for incidents that occurred in March, April, and May 2010.

18

it cannot be said that plaintiff's protected activity and her
eventual termination were completely unrelated.  A causal link
therefore exists between plaintiff's protected activity and her
termination.

Plaintiff has thus established a prima facie case of
retaliation.

B. Legitimate Nondiscriminatory Reason

Because plaintiff has established a prima facie case, the
burden shifts to the state to provide a legitimate
nondiscriminatory reason for the adverse employment action.  The
record reflects plaintiff was terminated for allegedly falsifying
logbooks and timesheets over a substantial period of time, which is
a legitimate nondiscriminatory reason.

C. Pretext

Pretext may be shown either indirectly, by showing the
employer's proffered explanation in unworthy of credence because it
is internally inconsistent or otherwise not believable, or
directly, by showing that unlawful discrimination more likely
motivated the employer.  *Lyons v. England*, 307 F.3d 1092, 1113 (9th
Cir. 2002).  Circumstantial evidence must be specific and
substantial.  *Id.*

"That an employer's actions were caused by an employee's
engagement in protected activities may be inferred from proximity
in time between the protected action and the allegedly retaliatory
employment decision."  *Raad v. Fairbanks N. Star Borough Sch.
Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (internal citations and
quotations omitted).  Temporal proximity can by itself be
sufficient circumstantial evidence of retaliation in some cases.

1   *Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003).

2       As discussed, there is at least a question of fact as to the
3   temporal proximity between plaintiff's protected activity and the
4   alleged adverse employment actions, and they are potentially very
5   close in time.  In addition to that, however, plaintiff has also
6   alleged the following statements by superiors: (1) Skolnik's
7   statement that he was going to do whatever he could to get rid of
8   plaintiff; and (2) Walsh's statement that plaintiff had to drop her
9   claim or "someone was going to get fired."  These statements
10  suggest a retaliatory animus by Walsh and Skolnik, who were both
11  involved in plaintiff's termination.  Combined with the temporal
12  proximity, genuine issue of material fact exists as to whether
13  plaintiff was terminated for legitimate nondiscriminatory reasons
14  or whether she was terminated for engaging in protected activity.
15  Defendants' motion for summary judgment on plaintiff's Title VII
16  retaliation claim must therefore be denied.

17      Plaintiff has not sued the individual defendants in their
18  official capacities, only in their individual capacities.  (*See* Pl.
19  Sec. Am. Compl. ¶ 2).  Individual defendants cannot be held liable
20  in their individual capacities for violating Title VII.  *Ortez v.*
21  *Washington County*, 88 F.3d 804, 808 (9th Cir. 1996).  Accordingly,
22  plaintiff's Title VII claim may only proceed against her employer,
23  the State of Nevada.

24      In their reply, the defendants argue for the first time that
25  the state cannot be a party to this case because plaintiff has not
26  provided proof that it served NDOC's director, as required by
27  statute.  *See* Nev. Rev. Stat. § 41.031.  The court does not
28  consider an issue raised for the first time in a defendant's reply.

*See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). However, because the record is unclear on whether plaintiff served the State of Nevada in compliance with § 41.031, the plaintiff shall, on or before October 19, 2012, file proof that service has been made in compliance with § 41.031.[11]

**III. Title VII Gender Discrimination**

Under Title VII, it is an unlawful employment practice for an employer to discriminate against any individual because of his or her sex. 42 U.S.C. § 2000e-2(a)(1). This claim is also analyzed under the burden-shifting framework outlined above.

The plaintiff's prima facie case of disparate treatment requires her to show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004).

Defendant argues that plaintiff has failed to identify any similarly situated individual who was treated more favorably, defining similarly situated as "any individual or group who was investigated and charged with falsification of log books and time sheets and who reported alleged improper use of pornography, and

---

[11] The court notes that while § 41.031 relates to the state's waiver of sovereign immunity, "the manner and timing of serving process are generally nonjurisdictional matters of procedure that do not condition the waiver of sovereign immunity." *Quality Loan Serv. Corp.  v. 24702 Pallas Way, Mission Viejo, CA*, 635 F.3d 1128, 1133 n. 5 (9th Cir. 2011) (internal alterations omitted) (citing *Henderson v. United States*, 517 U.S. 654, 656 (1996)).

was then terminated." (Def. Mot. Summ. J. 8). While this definition is far too narrow, plaintiff has failed to identify anyone similarly situated even in a broader sense with enough specificity to survive summary judgment.

In her deposition plaintiff identified Miller and Booth as similarly situated males who had reported misconduct in the workplace and had not properly completed log books who were not investigated or terminated. (Pl. Dep. 69:9-15). But nowhere does she provide any explanation as to what type of conduct Miller and Booth reported or in what way Miller and Booth improperly completed logbooks. Moreover, plaintiff was terminated for allegedly *repeatedly* falsifying not only the logbooks but also her timesheets, all after being counseled by her superiors to not do so. There is no indication anywhere in the record that Miller and Booth were similarly situated to plaintiff in this way.

Plaintiff, in support of this claim, also argues that defendants failed to act on her complaints of discrimination and pornography, but she does not argue or identify another employee who reported such claims to which the defendants did respond. Plaintiff has therefore failed to carry her burden that similarly situated individuals were treated more favorably than she was. *See Anthoine*, 605 F.3d at 753-54 (finding plaintiff failed to establish his gender discrimination claim because he had not offered any specific evidence on the circumstances of other employees allegedly discriminated against because of their gender).

It is unclear whether plaintiff is also asserting sexual harassment/hostile work environment claim. To the extent she is, however, she has also failed to support that claim.

A Title VII discrimination claim can be based on sexual harassment amounting to a hostile work environment. *See Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal quotation marks and citation omitted); *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (noting that harassment committed or tolerated by an employer is discrimination). Title VII does not prohibit all harassment, just harassment because of an individual's membership in a protected group. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

To prevail on a hostile work environment claim, plaintiff must show: (1) she was subjected to verbal or physical conduct because of her sex; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Mannatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003); *see also Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). In addition, the environment must also "both subjectively and objectively be perceived as abusive." *Brooks*, 229 F.3d at 923. That is, the plaintiff must show that she perceived the environment to be hostile, and that a reasonable person would find it to be so. *Equal Employment Opportunity Comm'n v. Prospect Airport Servs., Inc.*, 621 F.3d 991 (9th Cir. Sept. 3, 2010).

Whether conduct is sufficiently objectively severe or pervasive is determined "by looking at all the circumstances,

including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).  Title VII is not violated by simple teasing, off-hand comments, isolated incidents (unless extremely serious), or "mere offensive utterance of an epithet which engenders offensive feelings in an employee." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Brooks*, 229 F.3d at 926.  The court assumes the perspective of the reasonable victim in assessing the objective portion. *Id.* at 924. "If hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at plaintiff." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).

The record reveals just two examples of potential harassment linked to gender – the transmission of a video of a man's buttocks by Booth to plaintiff and everyone else in the workplace a significant time before plaintiff complained about it, and Miller's comment that he didn't want any more "f—ing females in the unit because they were too much trouble."  As far as the record reflects, Booth's forwarding of the video was an isolated incident and thus insufficient to support a hostile work environment claim. Miller's comment, coupled with the assertion that he shut plaintiff

24

out and ignored plaintiff's opinions, may suggest harassment based on gender.  But there is a distinct lack of specific examples that Miller's conduct pervaded the working environment so as to be both subjectively and objectively perceived as abusive.  Without more, plaintiff has failed to show sufficient evidence exists to support her hostile work environment claim.

As plaintiff has failed to establish a gender discrimination claim under either a disparate impact or a hostile work environment theory, the defendants' motion for summary judgment on this claim will be granted.

**IV. Res Judicata**

As plaintiff's First Amendment claim fails on the merits, the court need not decide it is barred by res judicata.  In terms of plaintiff's Title VII claims, the unreviewed agency determination is not entitled to preclusive effect.  *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 795-96 (1986) (holding that unreviewed state administrative proceedings do not have preclusive effect on Title VII claim); *see also Kremer v. Chem. Constr. Co.*, 456 U.S. 461, 470 n.7 (1982); *Snow v. Nev. Dep't of Prisons*, 543 F. Supp. 752, 755 (D. Nev. 1982).  Accordingly, defendants' res judicata argument with respect to plaintiff's Title VII claims is denied.

**Conclusion**

In accordance with the foregoing, the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART.**  The motion is denied as to the plaintiff's Title VII retaliation claim but is granted as to plaintiff's Title VII gender discrimination claim and her First Amendment retaliation claim.  Accordingly, the individual defendants, sued in their individual capacities – Howard Skolnik,

Jack Palmer, James Benedetti, Rod Moore, Lawrence Booth, James Baca, Edgar Miller, and Elizabeth Walsh – are dismissed from this action.  At this stage, the sole remaining defendant is the State of Nevada and the sole remaining claim is the Title VII claim.  On or before October 19, 2012, the plaintiff shall file proof that service has been made on the State of Nevada in compliance with § 41.031.

IT IS SO ORDERED.

DATED: This 21st day of September, 2012.

_____
UNITED STATES DISTRICT JUDGE